2015 VT 59

## State of Vermont v. Charles Madigan

[122 A.3d 517]

No. 13-242

Present: Reiber, C.J., Dooley, Skoglund and Robinson, JJ., and Hayes, Supr. J., Specially Assigned

Opinion Filed April 17, 2015

*Christina Rainville*, Bennington County Chief Deputy State's Attorney, Bennington, for Plaintiff-Appellee.

*Matthew F. Valerio*, Defender General, and *Anna Saxman*, Deputy Defender General, Montpelier, for Defendant-Appellant.

¶ 1. **Robinson, J.** Defendant Charles (Hank) Madigan appeals his conviction of three counts of lewd and lascivious behavior with a child. On appeal, defendant argues (1) that the trial court erred in allowing two witnesses to testify to the victim's character and reputation for truthfulness; (2) that the trial court admitted impermissible hearsay; and (3) that the prosecution's closing argument was improper. We reverse.

¶ 2. The testimony at trial reflected the following. The victim, A.R., had been close friends with defendant's daughter since early childhood. A.R. was somewhat estranged from her parents, who had divorced, and defendant acted as a sort of a surrogate father to A.R. After he and his wife divorced, defendant and his daughter moved to a three-bedroom home at the goat farm in Shaftsbury where defendant worked. Soon after that, A.R. — then a high school freshman — moved in with defendant and his daughter. Defendant supported A.R., providing furniture, food, and other items. A.R., in turn, performed farm chores. A.R. moved out some time in her senior year.

¶ 3. The charges related to three incidents which A.R. described in her testimony. The incidents occurred in the summer between A.R.'s freshman and sophomore years of high school. A.R. testified that defendant bought alcoholic beverages for her and was "hanging out" with her as they drank while sitting on the couch watching television. A.R. testified that this was the first time she had drunk alcohol, and that she had two or three drinks. A.R. testified that she fell asleep on the couch and, some time later, awoke in the dark and saw defendant "playing with" her pubic hair. A.R. testified that she pulled up her pajama bottoms and went to her bedroom and closed the door. She thought the incident "was so bizarre, so weird, that I thought it could have been a dream or a hallucination. I just didn't know." A.R. did not mention what had occurred to anybody, and she stated that she "purposely did not think about it," because "it would have brought up too many things to think about. Why did Hank do this? Why me?"

¶ 4. The second incident occurred sometime later that summer. A.R. testified that she was sleeping in her bedroom and woke to see defendant lying next to her in her bed, fondling her breast or chest, pubic area, and buttocks. A.R. testified in some detail about the incident, stating that upon awaking she moved away from him. A.R. testified that "after that point, I realized that . . . the first

event really did happen, but I didn't know who to tell or if anybody would believe me." A.R. testified that she feared that her friend would not believe her and that she would not be able to stay at the farm had she come forward. A third incident, later that summer, was similar to the second, and on the fourth occasion she woke up to find her hand on defendant's penis. Several days after the last incident, A.R. asked defendant for a lock on her door, because she "was worried that Hank would come in again." A lock was installed very soon afterward, and the incidents stopped. A.R. testified that "we didn't talk about what had happened; life just went on."

¶ 5. Later, during A.R.'s junior year, a close friend died, which had a profound effect on A.R. and her friends. A.R. became "very depressed" throughout that year and the next. A.R. continued living in defendant's home; she testified that she would check the lock multiple times before she could sleep, every single night. A.R. later left the farm and moved to her father's house. A.R. testified that after her friend's death, she told another friend that she had been abused by defendant, and then soon after told that friend's sister. A week or two later, a social worker-investigator with the Vermont Department for Children and Families contacted A.R., beginning the investigation which resulted in the prosecution of defendant. Defendant was convicted in a jury trial and now appeals.

### I. Testimony Concerning A.R.'s Character for Truthfulness

¶ 6. Vermont Rule of Evidence 608(a) provides:

> The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

¶ 7. The trial court permitted defendant's ex-wife and A.R.'s friend, J.H., to testify concerning A.R.'s reputation for truthfulness. In particular, the State asked J.H.: "You know that there's some kids who have a reputation for lying, some kids who have a reputation for being truthful. One way or the other . . . did [A.R.]

have a reputation?" J.H. responded that: "She was always very truthful." The court overruled defendant's objection to this testimony. Similarly, when defendant's ex-wife testified, the prosecutor asked her essentially the same question. Defendant's ex-wife replied that A.R. "is very truthful" and agreed that "she had a reputation as a truthful kid."

¶ 8. Defendant argues that allowing this testimony was error, both because his defense did not attack A.R.'s character for truthfulness, thereby "opening the door" to testimony concerning A.R.'s truthfulness, and because in both cases the State failed to lay a sufficient foundation.

¶ 9. Defendant never asserted that A.R. outright lied, but did offer the jury a narrative in which A.R. fabricated the accusations to get attention because she was jealous of her friend's success. In opening argument, defense counsel stated: "What happens with teenagers and girls is relationships split. Things change. One girl becomes popular; one girl doesn't. One girl is involved; one girl isn't. One girl remains in the shadow; the other one blossoms. And they see these things happening. . . . [A.R.] was a senior in school going nowhere. [Defendant's daughter] was going everywhere. And what [A.R.] did is brought the attention back to her."

¶ 10. Additionally, defendant suggested that A.R.'s prior accounts were inconsistent, unclear, or excessively delayed. For example, defendant offered testimony from A.R. to show that she could not recall, or may have been equivocal, on precisely how long the gap was between incidents, and attempted to show inconsistencies between what A.R. told investigators initially and what she said later. Specific issues that defendant addressed included whether A.R. was given alcohol by defendant or took it for herself, whether A.R. had been haying earlier in the day or did not remember what she did earlier in the day, whether the drawstring pajamas she was wearing were tied or untied, whether A.R. was wearing plaid pajamas or jeans at the time of an incident, whether she was wearing a bra, the precise characterization of defendant's movements and how he was touching her, and what exactly A.R. had told her friend, the first person she had ever told about the abuse. Defendant also questioned A.R. about her depression.

¶ 11. Defendant argues that the testimony he elicited at trial was impeachment by prior inconsistent statements or by lack of memory, and that testimony "to show that [A.R.'s] memory of

these alleged incidents was vague and she changed her story frequently" is not an attack on A.R.'s character for truthfulness. The State argues that by attacking "every aspect" of A.R.'s testimony, "including her mental health, her motives, her memory, the plausibility of [her testimony], and her supposed inconsistencies," defendant attacked A.R.'s character for truthfulness. We must decide, then, whether defendant made an "attack" on the "character of the witness for truthfulness" within the meaning of Rule 608. This issue is one that has not been substantially addressed by this Court.

¶ 12. ■ ■ The rationale for the general rule that "[t]he character of a witness may not be supported until it has been attacked" is that "[i]t is thought that the trier will assume that witnesses have normal character for veracity until there is evidence to the contrary," and "[i]t would be a waste of time and money to put in good character evidence about witnesses whose character has not been called into question." 5 R. Park & T. Lininger, New Wigmore: A Treatise on Evidence: Impeachment and Rehabilitation § 9.2 (2014). If character-for-truthfulness testimony was admitted "when there is only a conflict in the testimony of opposing witnesses, the opposing witnesses on both sides could be supported by sustaining testimony in regard to their standing and character, by reputation as witnesses, and the trial would be prolonged indefinitely." *Stevenson v. Gunning's Estate*, 64 Vt. 601, 609, 25 A. 697, 699 (1892). "The purpose of Rule 608(a)(2) is to encourage direct attacks on a witness's veracity in the instant case and to discourage peripheral attacks on a witness's general character for truthfulness." *United States v. Dring*, 930 F.2d 687, 690 (9th Cir. 1991).

¶ 13. ■ ■ The question of "what constitutes an 'attack' on the witness's character for truthfulness" is frequently a "murky" one. 4 J. Weinstein & M. Berger, Weinstein's Federal Evidence § 608.12[1] (2d ed. 2013) [hereinafter 4 Weinstein]. Our rule is identical to its federal counterpart. Reporter's Notes, V.R.E. 608 ("This rule is identical to Federal and Uniform Rules 608."); see F.R.E. 608(a)(2). Where "our rule is substantively identical to the federal rule," we often "look to federal case law in analyzing [its] meaning." *Coles v. Coles*, 2013 VT 36, ¶ 6, 193 Vt. 605, 73 A.3d 681. The advisory committee's note to the federal rule discusses the kinds of evidence that qualify as an attack on the character of the witness for truthfulness:

> [Evidence of] [o]pinion or reputation that the witness is untruthful specifically qualifies as an attack under the rule, and evidence of misconduct, including conviction of crime, and of corruption also fall within this category. Evidence of bias or interest does not. Whether evidence in the form of contradiction is an attack upon the character of the witness must depend upon the circumstances.

Advisory Committee Notes — 1972 Proposed Rules, F.R.E. 608 (citations omitted).

¶ 14. ■ Consistent with that guidance, courts generally decline to allow evidence of a witness's reputation for truthfulness in response to mere evidence of bias or interest. Such evidence "undermines the veracity and credibility of the witness . . . without implicating the witness as a liar in general." *Dring*, 930 F.2d at 691. For example, evidence that a witness in the case is a party's relative would not open the door to rehabilitative testimony to support witness's character for truthfulness — even though the clear implication is that the witness might lie for his relative's benefit — because the attack is not made against the witness's "character for truthfulness" generally. *Id.* By contrast, when a party suggests that a witness has a predisposition for untruthfulness and invites the jury "to infer that the witness is lying at present, simply because he has lied often in the past," this constitutes an attack on character for truthfulness sufficient to open the door to rehabilitation testimony. *Id.*

¶ 15. ■ ■ Impeachment by contradiction — including an emphasis on inconsistencies in a witness's testimony or inconsistencies between the testimony of different witnesses — also usually does not constitute an attack on a witness's character for truthfulness. 4 Weinstein, *supra*, § 608.12[4][a] & n.13 (collecting cases). We recognized this distinction more than a century ago. *Gunning's Estate*, 64 Vt. at 609-10, 25 A. at 699 ("It is observable that a distinction is taken between an attack upon the character of the witness as such for credibility, and the character of the testimony, given for belief. . . . [T]he character of the testimony given by a witness, does not directly attack the character of the witness for credibility." (emphasis omitted)). Such contradiction on specific matters is not usually viewed as sufficiently related to a witness's general predisposition to constitute an attack on character for truthfulness. 4 Weinstein, *supra*, § 608.12[4][a]. This is

true even if the impeachment by contradiction consists of "[v]igorous cross-examination, including close questioning of a witness about [the witness's] version of the facts and pointing out inconsistencies with the testimony of other witnesses."[1] *Dring*, 930 F.2d at 691.

¶ 16. ■ On the other hand, " '[a] slashing cross-examination may carry strong accusations of misconduct and bad character, which the witness's denial will not remove from the jury's mind.' " *Id.* at 692 (quoting E. Cleary, McCormick on Evidence § 49, at 117 (3d ed. 1984)). For that reason, " '[i]f . . . fairness requires it, [the judge] may permit evidence of good character, a mild palliative for the rankle of insinuation by such cross-examination.' " *Id.* (quoting Cleary, *supra*, § 49, at 117).

¶ 17. ■ Several considerations inform the analysis of whether impeachment by contradiction has called into question a witness's general character for honesty. One "is whether the inconsistency or contradiction relates to a matter on which the witness could be innocently mistaken," or whether the inference is that the witness is lying. 2 K. Broun, McCormick on Evidence § 47 (7th ed. 2013). "Another pertinent consideration is the number of inconsistencies mentioned by the cross-examiner. The larger the number, the stronger is the inference that by character the witness is a liar, not simply a witness who has told an isolated lie." *Id.* (citing *State v. Eugenio*, 579 N.W.2d 642, 648-49 (Wis. 1998) (holding evidence of witness's truthful character admissible only when court determines "that a reasonable person would consider the attack on the witness to be an assertion that the witness is not only lying in this instance, but is a liar generally")). The critical question is whether the attack on the witness's credibility suggests that the witness is lying *in this case*, or whether it goes further and

---

[1] Even aggressive impeachment by contradiction frequently calls into question "the ability of the witness to perceive or recall certain facts due to excitement, fatigue, poor eyesight, poor lighting, great distance from the event in question, or fading memory affected by the passage of time," and does not necessarily imply dishonesty in a specific instance, let alone a general character for dishonesty. *Dring*, 930 F.2d at 691 n.5; C. Mueller & L. Kirkpatrick, Evidence § 6.50, at 566 (4th ed. 2009) (impeachment by contradiction frequently does "not so much suggest untruthfulness as forgetfulness or lack of perception or judgment"); see also *State v. Tierney*, 839 A.2d 38, 45 (N.H. 2003) (an attack on credibility is not an attack on "general character for truthfulness").

attempts to show that the witness has a *general character* for dishonesty. See *Dring*, 930 F.2d at 692 n.6.

¶ 18. For these reasons, the bar against Rule 608(a) rehabilitation testimony in response to attacks on a witness's credibility is high. For example, in *State v. Carr*, the defendant's wife testified on behalf of her husband, who was charged with committing sex crimes against one of his stepdaughters. 725 P.2d 1287, 1288-89 (Or. 1986). The defendant's wife testified that the daughters were "rebelling right now" against their parents' attempts to impose discipline. *Id.* at 1289. When asked whether she was "trying to tell the jury that those two children are lying because they don't like the way you discipline them?" she responded, "Yes, I am." The wife was then asked, "You're telling this jury, are you not, that what [the children] said is not true?" and she responded "Yes, I am. All of it is not true. All of it." *Id.* The Oregon Supreme Court held that even this flat assertion that the children were lying was *not* an attack on the character of the witnesses, because, "testimony suggesting a motive of the victim to lie" does not raise the "issue of the truthful character of the victim" generally. *Id.* at 1291.

¶ 19. Similarly, in *Eugenio*, defense counsel "highlighted several inconsistent statements made by the victim concerning the circumstances surrounding her alleged sexual abuse" in opening statement and cross-examination, stated that "repeating a lie doesn't make it true," and suggested that the victim was lying for attention. 579 N.W.2d at 646-47. The Wisconsin Supreme Court held that this strategy was not an attack on the victim's character for truthfulness because "allegations of a single instance of falsehood cannot imply a character for untruthfulness just as demonstration of a single instance of truthfulness cannot imply the character trait of veracity," and a party may "attack the veracity of a witness's statements, and the intent or motive with which the witness makes the statements, without calling into question the general character of a witness for truthfulness." *Id.* at 648.

¶ 20. Likewise, the New Hampshire Supreme Court found in a sexual-assault case that the character for truthfulness of the witness-alleged victim was not attacked even where "the defendant questioned the complainant extensively about her pending civil suit against him" and "argued to the jury that the criminal prosecution was 'about money,' that money was 'what she's after.'" *State v*

*Ross*, 685 A.2d 1234, 1237 (N.H. 1996). The court held that such an attack was an "attempt to demonstrate bias or interest" and "did not amount to an attack on the complainant's general character for truthfulness," and thus the admission of two witnesses' testimony on "the complainant's truthful character" was improper. *Id.* See also *Michael v. State*, 235 S.W.3d 723, 724-28 (Tex. Crim. App. 2007) (holding, in child sex-abuse case, that impeachment of alleged victim with prior inconsistent statements to child-welfare workers did not "necessarily impugn[ ] . . . character for truthfulness"); *State v. Siegel*, 50 P.3d 1033, 1039-40 (Idaho Ct. App. 2002) (holding, in child sex-abuse case, that prosecution's suggestion that defendant's testimony was self-serving was not attack on his character for truthfulness). Cf. *United States v. Lukashov*, 694 F.3d 1107, 1117 (9th Cir. 2012) (holding, in child sex-abuse case, that alleged victim's character for truthfulness was attacked where defendant's entire strategy "from opening statement through closing argument" was to "not merely point out inconsistencies," but to depict alleged victim as "a liar" who had been directed by her mother to lie and who had given false evidence "not only . . . on the witness stand at trial, but . . . from the beginning," to police, physician, and child-welfare worker).

¶ 21. ▮▮▮ Under this stringent standard, we cannot find that defendant attacked A.R.'s character for truthfulness. Accordingly, the admission of testimony on A.R.'s character for truthfulness was improper under Rule 608(a). In suggesting that A.R. was jealous and made the accusations in this case to get attention, defendant undoubtedly called into question A.R.'s honesty concerning the allegations in this case. But defendant did not mount a broader attack on A.R.'s character for truthfulness. Nor did defendant's strategy of exposing inconsistencies in A.R.'s testimony amount to an assault on her general character for truthfulness. Defendant closely questioned A.R., but the clear focus was on allegedly inconsistent statements made by A.R., and on A.R.'s lack of memory and potential confusion on certain points. We find that defendant's suggestion that A.R.'s testimony was inaccurate or unreliable falls into the category of routine attempted impeachment by contradiction, and thus the admission of rehabilitation testimony on her good character was error. Were we to hold otherwise, the exception would swallow the rule. See *Pierson v. Brooks*, 768 P.2d 792, 796 (Idaho Ct. App. 1989) ("It cannot be

gainsaid that identification of . . . inconsistencies may reflect incidentally upon a witness's credibility. However, if this incidental effect were deemed to constitute an attack upon the witness's character . . . then the rule would be swallowed by its own exception.").

## II. Hearsay

¶ 22. Defendant next challenges the trial court's decision to allow A.R.'s friend J.H. to repeat to the jury statements A.R. made to her accusing defendant. The following colloquy occurred during the State's examination of J.H.:

> [PROSECUTOR]: Did you ask her about moving out . . . of Hank's place?
>
> [J.H.]: Yes.
>
> . . . .
>
> [PROSECUTOR]: . . . So she tells you, I'm moving out. What did you say?
>
> [J.H.]: I asked her why she was moving out. She was living there for years.
>
> [PROSECUTOR]: And what did she say to you?
>
> [J.H.]: She said that she had been sexually abused by Hank.
>
> [PROSECUTOR]: Now, did she say anything else in that conversation?
>
> [J.H.]: She said that she had a lock on her door that she tried to keep locked at night. She was afraid to have it unlocked.

¶ 23. ■■■ Defendant argues that the admission of this evidence is inadmissible hearsay. V.R.E. 802. Defendant promptly objected to this testimony at trial on these grounds, both before it was given, when the prosecutor made a proffer, and after it was offered. The State argued at trial that these statements fell under

the Rule 803(3) exception to the rule against hearsay, and the trial court overruled defendant's objection.[2]

## A. Rule 803(3)

¶ 24. ▮▮▮ V.R.E. 803(3) provides, in relevant part, that "[a] statement of the declarant's then-existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed" is not excluded by the general rule against hearsay embodied in V.R.E. 802. This exception is part of a family of exceptions, which includes Rule 803(1) (present sense impressions) and Rule 803(2) (excited utterances), that are admissible because they are "made in circumstances of spontaneity that supply the necessary element of trustworthiness." Reporter's Notes, V.R.E. 803; see also 2 Broun, *supra*, § 274 ("[T]he special assurance of reliability for statements of present state of mind rests upon their spontaneity and resulting probable sincerity. The guarantee of reliability is assured principally by the requirement that the statements must relate to a condition of mind or emotion existing at the time of the statement." (footnote omitted)).

¶ 25. ▮▮▮ For a statement to fall within the Rule 803(3) exception, "[t]he proponent must show that: (1) the statement was contemporaneous with the mental state to be proved, (2) the declarant had no time to fabricate or misrepresent thoughts, and (3) the state of mind is relevant to an issue in the case." *State v. Verrinder*, 161 Vt. 250, 258, 637 A.2d 1382, 1388 (1993) (citing *United States v. Carter*, 910 F.2d 1524, 1530 (7th Cir. 1990)). Rule 803(3) is commonly used to demonstrate fear, in such contexts as extortion prosecutions because fear is an element of extortion, and sexual-assault cases where statements of fear made to third

---

[2] The State asserts, in a single line of its brief, that "the objection was waived and is now subject to plain-error review" because "this evidence was not objected to at the time of J.H.'s testimony." We are puzzled by this assertion. Defendant objected to the testimony on specific grounds in a sidebar with the prosecutor and the judge, arguing that Rule 803(3) did not apply. Although the exchange between the court and counsel was brief, there is no doubt that this was a timely and specific objection as needed to preserve the issue under V.R.E. 103(a)(1). See *Billings v. Billings*, 2011 VT 116, ¶ 14, 190 Vt. 487, 35 A.3d 1030 (noting that where objection and evidence at issue was "specifically identified, and the court was aware of its substance," issue is preserved).

parties may assist in proving lack of consent. 2 Broun, *supra*, § 274 n.20; Mueller & Kirkpatrick, *supra*, § 8.38, at 849-50 (discussing use in extortion context); see also *State v. Newell*, 710 N.W.2d 6, 18-19 (Iowa 2006) (victim's statements to several other people that she was scared of defendant, wished to leave him, and feared for her safety were relevant "to rebut the defendant's position that he and the victim had a loving relationship"). An important limitation, however, is that the mental or emotional condition sought to be shown, "such as fear, must be relevant other than to prove the events giving rise to the fear." 2 Broun, *supra*, § 274 n.20.

¶ 26. By contrast, J.H.'s testimony — that A.R. told her that defendant had sexually abused her, that she had locks on her door, and that she was afraid to leave the door unlocked — was introduced not to show the victim's state of mind generally, but "to prove the fact remembered or believed." Such "backward-looking statements of memory or belief are excluded because . . . [they] present the classic hearsay dangers of memory and narration." 2 Broun, *supra*, § 276; 5 J. Weinstein & M. Berger, Weinstein's Federal Evidence § 803.05[2][b] (2d ed. 2013) (except in will cases, statement of memory or belief inadmissible to prove "earlier acts"). As one court has stated:

> [T]he state-of-mind exception does not permit the witness to relate any of the declarant's statements as to why he held the particular state of mind, or what he might have believed that would have induced the state of mind. If the reservation in the text of the rule is to have any effect, it must be understood to narrowly limit those admissible statements to declarations of condition — "I'm scared" — and not belief — "I'm scared because Galkin threatened me."

*United States v. Cohen*, 631 F.2d 1223, 1225 (5th Cir. 1980); see also *United States v. Taubman*, 297 F.3d 161, 164-65 (2d Cir. 2002) (per curiam) (holding that trial court properly excluded testimony by defendant's assistant, which would repeat statements purportedly made by defendant following a meeting related to charged conspiracy, because Rule 803(3) exception does not apply to statements "about a meeting that had already happened"); *United States v. Cardascia*, 951 F.2d 474, 486-88 (2d Cir. 1991) (holding that backwards-looking statements in resignation letter stating

that writer had disagreed with company's extension of loan to defendant were properly excluded, because Rule 803(3) does not permit state-of-mind evidence in order to "provide an inference of the happening of an event that produced the state of mind"). In sum, the State here offered just the sort of evidence that Rule 803(3) does not allow.

## B. "Fresh-complaint doctrine"

¶ 27. The State urges, as an alternative to Rule 803(3), that this Court affirm the evidentiary ruling on the basis of the "fresh-complaint doctrine." This evidentiary doctrine — also known as the "report-of-rape," "prompt-outcry," or "first-complaint" rule, among other names — is an exception to the ordinary rule that "bolstering" hearsay testimony of a witness's prior consistent statements is inadmissible. The doctrine is a vestige of a time when corroboration was a required element of rape, and evidence of a complaint soon after the crime occurred served "to explain an apparent inconsistency arising from the woman's failure, at the time of the alleged rape, to tell someone of the crime when society perceives that it would have been natural for her to do so." *Battle v. United States*, 630 A.2d 211, 216 (D.C. 1993) (tracing history of corroboration requirement and "report-of-rape" rule). In essence, the fresh-complaint doctrine ameliorated the presumption that jurors would find claims of sexual assault inherently untrustworthy. See, e.g., *State v. Woodard*, 769 A.2d 379, 384 (N.H. 2001) (noting that the "doctrine of fresh complaint . . . was based on the presumption that a sexual assault victim would immediately confide in someone and that if no complaint were made, it could be assumed that no assault occurred"). The question of whether Vermont recognizes the "fresh-complaint doctrine" was expressly reserved in *State v. Fellows*, 2013 VT 45, ¶ 22, 194 Vt. 77, 76 A.3d 608.

¶ 28. ▉ ▉ While a few courts have adopted this rule in modified form,[3] "[m]ost courts no longer recognize this theory," Black's Law Dictionary 782 (10th ed. 2014), and the idea of a

---

[3] See 2 Broun, *supra*, § 272.1 n.8 (noting that a minority of states follow modified version of doctrine); see also *Battle*, 630 A.2d at 221-22; *Commonwealth v. King*, 834 N.E.2d 1175, 1197-98 (Mass. 2005); *State v. Hill*, 578 A.2d 370, 377-80 (N.J. 1990). These courts significantly differ on the application of the doctrine. For example, some allow only testimony as to the fact of the complaint, see *Hill*, 578

doctrine as a distinct rule in derogation of the rules of evidence is largely a "historic artifact." 2 Broun, *supra*, § 272.1 (contrasting fresh-complaint rule with "modern practice"). We reject the "fresh-complaint rule" as an independent evidentiary doctrine because the doctrine has been largely supplanted by rules of evidence. Rather than having a freestanding evidentiary doctrine apart from the rules of evidence, most courts sensibly prefer to apply the same rules of evidence in sexual-abuse cases as in other cases. Courts frequently and properly evaluate evidence of a victim's past out-of-court statements, including statements that would fall within the "fresh-complaint" doctrine advocated by the State, under the ordinary rules of evidence. In some cases, the statements are not hearsay because they are not offered to prove the truth of the matter asserted, but rather are offered for other purposes, such as a prior consistent statement offered to rebut a charge of recent fabrication, Rule 801(d)(1)(B),[4] or evidence to establish the timing or circumstances of a report rather than the truth of the claim reported.[5] In other cases, the statements are admissible pursuant to an exception to the general prohibition of hearsay, such as the exceptions for excited utterances, V.R.E. 803(2), statements made for purposes of medical diagnosis or treatment, V.R.E. 803(4),[6] and certain out-of-court statements

---

A.2d at 378, while others allow details of the complaint to be admitted, see *King*, 834 N.E.2d at 1197.

[4] E.g., *Monday v. State*, 792 So. 2d 1278, 1281-83 (Fla. Dist. Ct. App. 2001) (victim-witness's prior consistent statement was admissible for rehabilitation, because it could be useful to jury for credibility finding); *James v. Commonwealth*, 360 S.W.3d 189, 205-07 (Ky. 2012) (prior consistent statements of victim to detective admissible to rehabilitate credibility, not as substantive evidence); *State v. Young*, 743 A.2d 1275, 1277-81 (N.H. 1999) (victim's prior consistent statements were admissible to rebut defendant's allegation of victim's improper motive to fabricate the occurrences of sexual assault); *Tombroek v. State*, 2009 WY 126, ¶¶ 5-13, 217 P.3d 806 (physician's testimony on two statements made by victim identifying the individual who had sexually assaulted her were admissible as prior consistent statements).

[5] See, e.g., *People v. Brown*, 883 P.2d 949, 960 (Cal. 1994); *Woodard*, 769 A.2d at .384.

[6] E.g., *State v. Slater*, 908 A.2d 1097, 1099, 1101-08 (Conn. App. Ct. 2006) (victim's statements to strangers and to emergency-room staff were excited utterance and statement for purposes of medical treatment, respectively); *State v. Neitzel*, 801 N.W.2d 612, 621-22 (Iowa Ct. App. 2011) (victim's statements admitted under the hearsay exception for statements made for the purposes of medical diagnosis or treatment); *Medina v. State*, 143 P.3d 471, 473-75 (Nev. 2006) (victim's statement

made by children who are twelve years of age or under and who are the putative victims of abuse, neglect, or certain sexual crimes. V.R.E. 804a(a).[7] We join those courts that have declined to apply a separate "fresh-complaint exception" to the hearsay rule, while recognizing that the evidence sought to be admitted pursuant to the fresh-complaint doctrine is often, though not always, admissible under our modern rules of evidence. See, e.g., *Brown*, 883 P.2d at 950 (noting that "generally applicable evidentiary standards" adequately serve goal of ascertaining truth); *Browne v. State*, 132 So. 3d 312, 316 (Fla. Dist. Ct. App. 2014) (finding that "adoption of the Florida Evidence Code eliminated any common law hearsay exceptions not codified" and that common-law fresh-complaint rule is no longer a valid exception to prohibition on admitting hearsay testimony); *State v. Robinson*, 989 A.2d 965, 979 (R.I. 2010) (evaluating out-of-court statements in child-abuse case under ordinary hearsay rules rather than fresh-complaint doctrine).

### III. State's Closing Argument

¶ 29. Finally, defendant challenges the State's closing argument. The prosecutor, in her principal closing argument, described to the jury A.R.'s family's relative material privation and the benefits she enjoyed living on defendant's farm as a way of explaining why A.R. stayed in defendant's home after the alleged incidents. In the State's rebuttal closing argument, the prosecutor went further, stating:

> [PROSECUTOR]: Questions . . . [that the defense] raised about, you know, she could work at the farm in

---

to neighbor was excited utterance); *State v. Stahlnecker*, 690 S.E.2d 565, 572-73 (S.C. 2010) (victim's statement to mother was excited utterance); *State v. Ladner*, 644 S.E.2d 684, 690-93 (S.C. 2007) (victim's statement to caretakers was excited utterance); *State v. Smith*, 909 P.2d 236, 238-41 (Utah 1995) (statement by victim to investigator was excited utterance); *State v. Huntington*, 575 N.W.2d 268, 272-74, 277-78 (Wis. 1998) (statements to investigator were exited utterance and victim's mother's statements to nurse were statements for purposes of medical treatment). Cf. *State v. Cagley*, 638 N.W.2d 678, 680-82 (Iowa 2002), *People v. Hackney*, 455 N.W.2d 358, 360-64 (Mich. Ct. App. 1990) (both evaluating victims' statements and finding that hearsay exceptions did not apply under facts of case).

[7] If we were to adopt a new freestanding doctrine allowing the admission of the out-of-court statements of A.R., who was around sixteen at the time the statements were made, it would conflict with the exception to the hearsay prohibition for certain reports of sexual and other abuse by children, which is limited to children aged twelve or under.

Shaftsbury if she moved out? Huh? She's [fourteen]. How is she going to get there? Her mom lives in Bennington. She's going to work on a farm in Shaftsbury? I mean, that's nonsensical. And think, again, what it would be like to be [A.R.]. Poor.

[DEFENSE COUNSEL]: Judge —

[PROSECUTOR]: Maybe hungry.

[DEFENSE COUNSEL]: — I think it's improper. We'll object.

[THE COURT]: Overruled. I think it's based on the evidence.

[PROSECUTOR]: People who are poor and need housing subsidies. Maybe she's hungry. We don't know. We didn't hear testimony about that. But all she owned was a couple [of] books. That's her life possessions at age [fourteen]. And she's supposed to give up everything to tell, even though the abuse [has] stopped. It makes no sense at all. The lock. You know what's important about the lock? The lock is when she said no. That's what it was.

¶ 30. ▮▮▮ "The longstanding rule in Vermont is that counsel should confine argument to the evidence of the case and inferences properly drawn from it." *State v. Lapham*, 135 Vt. 393, 406, 377 A.2d 249, 257 (1977). While counsel "are entitled to a good deal of latitude in their closing arguments, they are 'bound to keep within the limits of fair and temperate discussion . . . circumscribed by the evidence in the case.'" *State v. Rehkop*, 2006 VT 72, ¶ 35, 180 Vt. 228, 908 A.2d 488 (quoting *State v. Hannett*, 54 Vt. 83, 89 (1881)). This obligation is a particularly essential one for prosecutors. Although prosecutors must "present the State's case with earnestness and vigor," they also have a "corresponding duty to refrain from improper methods . . . and to guard against conduct unintentionally trespassing the bounds of propriety." *Lapham*, 135 Vt. at 406, 377 A.2d at 257.

¶ 31. ▮▮▮ Viewed in their entirety, the prosecutor's statements — exhorting the jury to imagine "what it would be like to be A.R. . . . poor . . . maybe hungry" — exceeded the bounds of

fair and temperate discussion, circumscribed by the evidence and inferences properly drawn therefrom. By the prosecutor's own admission, there was no testimony presented at trial that A.R. was "hungry," and the bald invitation for the jury to consider this speculation was improper. The effect of such statements was not only to interject facts of little or no relevance to defendant's guilt or innocence, but also to prejudicially play upon the jurors' natural sympathy for the victim, a risk made more potent by the prosecutor's exhortation to the jury to "think, again, what it would be like" to be A.R. "This Court has often condemned arguments made to the jury in which the prosecutor makes inflammatory statements or appeals to the sympathies of the jury." *State v. Bubar*, 146 Vt. 398, 403, 505 A.2d 1197, 1200 (1985); *Duchaine v. Ray*, 110 Vt. 313, 321, 6 A.2d 28, 32 (1939) (noting that counsel's urging of jurors to place themselves in victim's shoes was a "highly improper," "lamentable departure" from rule against appeals to jurors' prejudice).[8]

## IV. Prejudice

¶ 32. ■■■ The fact that the challenged evidence of A.R.'s reputation for truthfulness and the challenged hearsay evidence were improperly admitted, and that the State's closing argument was improper, does not end our inquiry. When the admission of evidence, exclusion of evidence, or propriety of argument is objected to in the trial court and raised on appeal, we review for harmless error, determining whether (1) the ruling was erroneous, and (2) if so, whether "a substantial right" of defendant was affected. V.R.E. 103(a); see also V.R.Cr.P. 52(a) ("Any error, defect,

---

[8] Although not material to our judgment, we also express our displeasure with the State's decision to include in its briefs inflammatory material from outside the record. The State's brief refers to testimony by defendant's stepdaughter at the sentencing hearing that she, too, had been abused by defendant. The State's brief also refers to another alleged victim, who did not testify at trial and whose statements would be inadmissible hearsay in any case. Both topics are irrelevant to any issue in this appeal. Such extraneous material is unhelpful to the Court's decisionmaking and does not belong in filings before this Court. See V.R.A.P. 28(a)(3) (statement of the case in briefs should address "the subject of the litigation, the claims of the parties, the facts of the case and proceedings below"). Any future brief containing irrelevant material may be struck in whole or in part. *Napro Dev. Corp. v. Town of Berlin*, 135 Vt. 353, 355, 376 A.2d 342, 345 (1977) (granting motion to strike materials "not properly before us because they are not part of the record" and "will not be considered on review").

irregularity or variance which does not affect substantial rights shall be disregarded."); *State v. Herring*, 2010 VT 106, ¶ 4, 189 Vt. 211, 19 A.3d 81 ("In the event of error, we may nevertheless uphold a conviction 'if we find that the error was harmless beyond a reasonable doubt.'" (quoting *State v. Lipka*, 174 Vt. 377, 384, 817 A.2d 27, 33 (2002)); *State v. Hemingway*, 148 Vt. 90, 92, 528 A.2d 746, 748 (1987) (reviewing closing argument for harmless error).

¶ 33. ▮▮▮ Here, we cannot say beyond a reasonable doubt that the erroneous admission of the evidence and the improper closing argument were harmless. A.R. was clearly the State's star witness, and the only witness to the alleged offenses. The State relied heavily on A.R.'s testimony in closing argument, and the jury's belief in A.R.'s credibility must have been pivotal. It is reasonably possible that the testimony of two vouching witnesses on A.R.'s truthful character, as well as the testimony of one of them essentially repeating her accusation against defendant, may have affected the verdict. See *State v. Blair*, 155 Vt. 271, 276, 583 A.2d 591, 594 (1990) (finding, in sexual-assault case that "was a credibility contest between the victim and the defendant," that "[w]e can not say that a third party's opinion of the credibility of the victim could not have tipped the scales such that defendant would have been acquitted"). The prosecutor's closing argument furthers our belief that the combined errors could not be harmless. See *State v. Percy*, 146 Vt. 475, 486, 507 A.2d 955, 961 (1986) (finding that "cumulative effect of" improper admission of evidence and prosecutor's improper remarks in closing argument "necessitates reversal").[9]

*Reversed and remanded for further proceedings.*

---

[9] Because we conclude that the trial court improperly admitted testimony concerning A.R.'s character for truthfulness, and reverse in part on that basis, we need not reach the question of whether the State laid sufficient foundation for the testimony.